Okay, we're all set. Go ahead, Mr. McCall. I have to tell you, when I first looked at the minutes, I thought your name was Edward S. McCool. I thought that is a great name, Mr. McCool. You missed it by one vowel. I did indeed, but we do the best we can with what's on the birth certificate. Good morning, your honors. My name is Ed McCall. I'd like to reserve three minutes for rebuttal today as I represent my good friend, Nicoleus Vastardis, who appreciates the opportunity to be listening via YouTube from Greece, where he is a wonderful family man, an outstanding mariner, and very, very interested in this appeal. It's an important appeal not only to Chief Vastardis, but also to the hundreds of seafarers like Chief Vastardis who have been held in this country as the objects of agreements on security, literally human collateral, sometimes for years, often for many months. Chief Vastardis, before he was a defendant, he was held as human collateral, substitute security for the release of the vessel on which he lawfully arrived in this country. Let me get straight to my concern here, and that's your argument. If you extend it to its logical conclusion, maintaining the logs would be, would impose no responsibility on maintaining accurate logs. So why should we not follow the Second and Fifth Circuit's opinions that make it clear that maintaining a log means that they have to be accurate? Your honor, I respectfully, the court does not need to disagree that requirement to maintain involves accuracy. He was agreeing they weren't accurate in this case, correct? I would not, your honor. I wouldn't agree that any of them were inaccurate, but we haven't challenged the sufficiency of the evidence concerning accuracy of entries made on the high seas. What's the point of maintaining them if they're not going to be accurate? The only obligation to maintain the records is while you're here. If Congress or maintained financial records while you had a PPE loan or during a particular calendar year, and it turned out your records weren't accurate for the prior year, it would be a quite a stretch to say that you had violated that regulation. But what value would these records have if they were not maintained up until the point they entered U.S. waters? Well, the question isn't just whether they have value. The question is whether there's a criminal violation of the regulations, your honor. Yeah, but we have to use common sense for meeting the regulations and the statute. And if you're saying that they only have to be accurate once you enter the territorial waters of the United States, I would assume that the entries in the oral record book would have been made previously while you were on the high seas because the discharges are not, well, they may be made in U.S. waters, but these discharges here are not made in U.S. waters. They're made on the high seas, which is part of your argument, in fact. But significantly, your honor, the requirement to maintain the records doesn't exist under any country's laws using that word outside of the United States. And neither the- Is that word accurate? You're saying that word is accurate. There's an obligation codified to maintain records. In our reply brief, we outlined four possible interpretations of the requirement to maintain a record and suggested that the most logical one includes maintain them accurately while you're there. But that does not imply U.S. jurisdiction or Congress's intent to punish whatever you did on the high seas. And neither the Fifth Circuit in Joe nor the Second Circuit in Ionia management noted, and I've gone back and looked at the briefs and they weren't told, and Joe relied on a case from up here in Maine that I handled back in 2007, and I hadn't noticed that the word maintain is not in the MARPOL regulations, which are regulation 17 to annex 1 to MARPOL. All of those requirements, which are the law virtually everywhere in the world except for the United States, simply tell you to make entries. Now, do you have- Is it implied that they need to be accurate? It's implied that they need to be accurate. The argument here really is that the regulations were inaccurate because they didn't describe a suspected deficiency in the equipment. Nothing false in any of the entries has been identified. It's a substantial stretch of our regulations for the purpose of prosecuting foreigners for events we suspect happened on the high seas. And the consequence of that interpretation of the word maintain, which no court- And frankly, your honors, I explained it to the lower court in this case and the related case. We did. I don't believe- None of the courts that have decided this issue have even noted that the word maintain is unique to the US regulations, nor have they- And it's not in the MARPOL regulations, not in the treaty, nor have they noted that the word main- Where the it did not come from MARPOL regulations. It came from old regulations under the Oil Pollution Act of 1961, which expressly required US flag vessels to maintain a record book. Nicole, can I try this? Can I try this question on you? This comes from Abrigal. You might be familiar with that case. And we said in that case that under the sentencing guidelines, we explained without hesitation that Abrigal's offensive conviction was failure to maintain an accurate oil record book while in the navigable waters of the United States. What is your response to that? And your honor, the issue of whether that was an offense defined by American law wasn't before the court in Abrigal because it was only a sentencing issue. It's still very helpful to you. I mean, it's not an all force. And your opponent's argument is that we should look more at Joe because that is more an all force. That's not a sentencing issue. But it does seem to me that Abrigal is very, very favorable to your position. I agree completely, your honor. And Judge Andrews below noted the distinction between it and Joe and recognized that this court might be ready to revisit whether that is- It makes it he invited it. He did in response to our argument, frankly, in a related case. But he did and he's plainly correct. And importantly, your honors, what's happened here, both Joe and Ionia management say, if we don't interpret the word maintain and they're plainly mean as used in Marple because they thought it was there. It's not in the treaty, but they figured it was because the treaty says all the signatories will adopt the attached regulations. We adopted, we just carried forward some old regulations from OPA 61 that were different. And when we did that, the secretary and the Coast Guard specifically said, we're not adding any record keeping requirements. And there weren't any for foreign vessels. And they had to opine on whether they were doing that because of the Paperwork Reduction Act of 1980. So what the history was is actually quite clear in the regulations. And in addition, when they promulgated those regulations, they specifically said these regulations will prevent pollution from US flagships everywhere. And they'll prevent pollution from foreign flagships here only. The intention was that they would be interpreted that way, consistent with Marple overall, and that the system of international enforcement would be as prescribed by Marple, which is a report to the administration, which is defined by Marple as the flag state. And that the reporting country, the port state often, has the right to give a report from the flag state. What'd you do about this? Did you investigate it? Did you bring a case? Or what was the punishment? And if we don't like the punishment, we can arbitrate against the flag state in the International Maritime Organization. And all of that was explained, and it summarized in the brief, by EPA Executive Director Russell Train, the second Executive Director of the EPA, to the Senate that ratified the treaty. He explained that we, the United States, negotiated in Marple for the rights of port states to enforce the treaty on a worldwide basis if they discover a violation that happened on the high seas while a vessel was in their port. And that request was rejected in drafting the treaty. So part of the reason the ABRGAR is so helpful is that, and it was ahead of these other decisions, it said not only is the requirement for U.S. conduct a jurisdictional issue, it's not just a jurisdictional element with respect to these prosecutions of foreigners and foreign vessels. It's a substantive element of what Congress has reached out to regulate, sanction, and punish. And going behind ABRGAR, which, Your Honor, I agree is very helpful to the defense in this case. So let me ask you, if I understand your argument, it would be okay then for the captain of a ship to maintain two different sets of books, one when you're not in U.S. waters and one when you're in U.S. waters. And doesn't Marple also make it clear that any failure of the oil filter and equipment has to be noted in the book? So regulation 17 requires a notation in the record book of a failure of the oil record book, which would be? It has to be an accurate notation, right? So the correct way to state that, Your Honor, with due respect is that in this case, Liberian law required it on the high seas. Because Marple is not a self-effectuating treaty, so it's implemented by the flag state for the high seas. But Liberia has adopted it, and Liberian law therefore includes a requirement that an entry be made on the high seas if the in this case, right? There's not, with respect to the four discharges, there's not an entry that there was a failure of the equipment. And that's the government's theory as to what's wrong with the records. But significantly, Your Honor. So under your matrix, if I'm the captain, can I maintain two separate sets of books? I'll keep a book when I'm in the U.S. waters, and I'll keep a book for the rest of the world, and that's all good? So it might be good, Your Honor. That'd be okay? All right. No, no. Well, I don't think it would be okay. It might not be a violation of U.S. law. It would plainly be a red flag that something's up with this ship. And we got to get the flag state involved, and we got to find out what's up with this ship, and it probably should be prosecuted, and something should happen, and there should be some substantial penalties. But what shouldn't happen, Your Honor, is that a flag state, and in our appendices to the brief, we point out that in adopting the treaty and the regulations, the U.S. said, one of the advantages for us in this treaty is we certify a vessel, it won't get hassled in foreign ports if it's got a valid certificate. What really happens is that a group of U.S. lawyers have decided on a worldwide basis, we're going to enforce MARPOL. You can quickly, the trial attorney in this case, Mr. Udall, you can quickly find YouTube videos where he's advertising for foreign seafarers to tell the United States, not their employer, not their captain, not their flag state, about high seas events. And we, the United States, enforce MARPOL, and we're plainly advertising that we do it on a worldwide basis. And these are the expansive interpretations of statutes and regulations that we're using to do it. And the practical problem the government had when they decided on trying that worldwide enforcement regime a couple decades ago, is they can't prove the case. They've got to have these foreigners available to investigate and prove the case. And then they figured out the way to have them is that we're entitled to bond because the vessel is liable in REM for a potential fine, will demand money and people. Do you have time for a question? I'm sorry. Do you have a moment for a question? Go ahead, William. Maybe you can address what appears to be completely deceitful conduct in this case. That is that the, I don't know if it was the ship captain or somebody that was involved, it seemed to be purposefully deceiving the inspectors so that they would not discover the situation with regard to the oil on the ship or the oil discharge. Can you address that? I can, Your Honor. In terms of the record evidence, significantly here, the defense at trial pointed out that there isn't any evidence of pollution, that the Coast Guard disassembled the discharge piping and there isn't any claim, this isn't a magic pipe case. There isn't a claim that anybody just bypassed the pollution control equipment. There's a claim that valves were in the incorrect position and the oil content meter wasn't working correctly or was defeated. But as they always do, the Coast Guard disassembled the discharge piping, tested it, looked at satellite images to determine whether there was evidence of pollution, whether oil went out the discharge piping. They didn't find any. There's no evidence of it in the case. So in terms of whether, and in closing argument, government counsel said, whether there was any oil in the water is a red herring here. This isn't about that, it's about record keeping. So we've gone to the extreme of demanding, in this case, 11 foreign seafarers be left behind as substitute collateral for the release of a vessel for the bypassing. What really got bypassed here, your honor, is the international enforcement regime prescribed by MARPOL, which our country has never invoked. We have never used the system of international cooperation through the flag state. And if it's a recalcitrant flag state, go to the IMO and say, these guys aren't enforcing the treaty. Now, I don't know if it's because we're arrogant or we just think they won't do it, but that's the system we agreed to in MARPOL. It's the system Congress fashioned in Abts and Judge McKee. I agree it's the system that Abregar looks to, although of course it doesn't address the underlying issue of whether there would be a U.S. crime if all you did was make bad records on the high seas because Mr. Abregar pleaded guilty that that was a U.S. crime. So the issue wasn't- One thing that puzzles me is the district court charged the jury that he could not be, and correct me if I'm wrong, charged the jury that the counts did not apply to conduct on the high seas, only in the United States. And that actually has my mind bent into a twist because that seems like an accurate charge, but yet I don't understand how they could have been convicted for conduct on the high seas given that instruction. The argument you make about commission of training, it seems to me, is something that Joe didn't look at, Iona didn't look at, and it's a very forceful argument. The legislative history here that we don't usually look at, but I think here we have to look at it because arguably there's an ambiguity, not as concerned about the accuracy argument. The accuracy argument seems to me, I'm troubled by your argument that, excuse me, if you maintain records or keep records, they've got to be accurate. Otherwise, why have to do records? That's not my problem. The problem is, and this is probably not for you, but for your opponent, given the train's testimony and our Arbogast decision, I don't understand how he could be convicted for something that didn't happen in U.S. territorial waters. But let me ask you, wouldn't count three and count four still stand? Because the instruction that was alleged, and proven, occurred in the port location, not on the high seas, the obstruction under 1505, under count three, and the false statements under 1001. I have a tougher argument on counts three and four, your honor. Count two is an interesting attempt to, I would say, abuse Sarbanes-Oxley. Count three and four are closer questions. They turn on the extent to which there needs to be a proceeding in a matter within the Coast Guard's jurisdiction. We respectfully submit that this strategy of enforcing on a worldwide basis, which is literally advertised on YouTube by trial attorney Udell, shows that we have an agency that's decided to go beyond its jurisdiction, beyond what Abragar says. It isn't even just a jurisdictional issue. It's what defines a U.S. crime at all. And we've decided to supplant the international enforcement regime, which we completely disregard, that Abragar should teach us is the way you're required to go consistent with the treaty and with the acts of Congress. So I guess you're arguing that proceeding would be required, but if the proceeding is one that is a, using your argument, a trumped up proceeding, a proceeding that has no basis under the statute or the regs, you can't use that proceeding to bootstrap an obstruction of justice for interfering with a proceeding that was beyond the jurisdiction of the United States. That's precisely correct, Your Honor. And I would just say further that there's been, I'm on the panel up here in Maine, and the AUSAs up here in is pronounced, but they'll be very surprised by it because almost all of the drug convictions up here are conspiracy cases, which is an inchoate offense under clear Supreme Court precedent, INLE and other cases. And it's a wonderful decision by the court unanimously, reinforcing the notion that we need to take a close look at statutes that are enforced criminally and make sure that we're not giving them a broad interpretation to ensnare people or unfairly prosecute them. This doubly the case here, Your Honors, because not only are we giving a broad interpretation in some of this precedent to these statutes, but we're using it for the purpose of prosecuting foreigners who have not had any de-prescribed international enforcement regime established by Marpole, adopted by Congress, and recognized by ABRGAR. And so there's been a series of decisions over the last five or so years, including the Supreme Court and this court. The Yates decision, which is a Sarbanes-Oxley decision, which holds that a fish is not a tangible object. And I first heard of that decision, the First Circuit Conference one year, the guest speaker was the solicitor general, and he said, who here in the room thinks a fish is not a tangible object? And nobody raised their hand. He said, well, you're not going to get appointed to the Supreme Court because I lost on the issue of whether a fish is a tangible object. It's a fish story. It is a fish story. You know, Kaiser, of course, is an important case in this regard. Which is a stunner for lots of courts. And then this court's decisions in Nassar and Hera speak to this rebirth of the notion that we need to look at these statutes carefully and not get too caught up in, well, wait a second, the defendant is saying he can get away with it because if what happened here is what the jury found, then there should be prosecution. It should be through the flag state because one of the laws that we, as Americans, respect is the process of law, the rule of law that limits on authority. You said it should be the flag state, and I guess in this case, it would be Liberia. So you would say that the nation of Liberia should be the one to consider the issue and whether there should be any sanction or not. Is that what your argument is? Yes, Your Honor, that's precisely correct. Importantly, though, as Executive Director Crane said, if we come to the conclusion that Liberia has given somebody a pass or they're handing out slaps on the wrist, our remedy, the remedy of the United States of America is to arbitrate in front of the International Maritime Organization. For this conduct, the treaty says, and this is carried forward in the Acts, which talks about the secretary of states involved, the administration is the Republic of Liberia. The organization on top of the administration is the International Maritime Organization. Let me ask you this. It is really very well known that there is a record-keeping requirement. Records have to be kept, and there's a purpose when you go to port that you show those records, and that's what the Coast Guard does. They look at these records. What is the point of the whole process if we can just say the records, if the records are inaccurate? Well, sir, Your Honor, the point of the process should be if you have reason to think high seas records are inaccurate, that you will follow the enforcement mechanism that the treaty and I just outlined. What really happens in our country, Your Honor, is that, and the testimony was directly on point, that the lead official who went on board went right to the oil record book, and he wasn't relying on it. He was looking for entries made on the high seas so that he could investigate whether they were or weren't accurate, and so that that could be turned into a U.S. crime, and the U.S. could exercise worldwide enforcement against these foreigners, and I represented everybody on that vessel for a while. All 32, I think it was, seafarers filed petitions for habeas relief. They were held here for a month while the Coast Guard wanted them here to continue its investigation, and the other, another agency in the Department of Homeland Security, Customs and Border Patrol, wanted to make sure, whoa, that none of them were seafarers, so we couldn't decide if we wanted them in, we wanted them out, and we held them in the middle of the day for a month. The treaty says you cannot unreasonably delay a foreign flagged vessel for a port state investigation. APPS says that too. The vessel has a remedy if it gets unreasonably delayed. Neither the treaty nor APPS say the crew has a remedy if it gets unreasonably delayed, because it didn't occur to anybody on the planet, in other words, that any country would take human beings as substances collateral for the vessel, but that's what we do, so as a result, when we finally let the vessel go, 11 crew members, none but the chief had been accused of anything wrong, none of them ever said they had any knowledge of any misconduct by the chief or anybody else, they were held in the United States of America for 90 days, because we won't comply with the system of international, international enforcement that is prescribed by the treaty, by the statute, and by this court in Abradon. We won't do it, and we won't do it because either some people want some glory, or we don't trust the flag states, or we don't trust the American organization, but that's the structure we agreed to, that's the system we agreed to, and we need to hold ourselves to that standard of honoring our agreements, our treaties, and our laws, and not figure out, hey, how can we get around them and prosecute somebody, because we think he did something wrong, he's not a U.S. citizen, none of it happened here, and it didn't have any adverse effect on us, although I agree, Judge McKee, it gets to be a closer case. If you find that somebody lied to a U.S. employee, that it wasn't a phony investigation, that's a tough case. Okay, can the U.S. enforce a record-keeping violation if oil is discharged outside of its jurisdiction, can it enforce that violation when the ship the country and left its oil record claim, for example, or claim that didn't, or affirmatively say it didn't happen? In my opinion, under the treaty, it's clear that what we have to do then is report it to the flag state and insist on prosecution, which we are entitled to do. Well, you're entitled to it, but that doesn't mean that's going to happen. It's never happened, never happened, because it's so much more enjoyable for government lawyers to just do it here. But that's what's being bypassed, because this entire system that we negotiated, set up, and agreed to, and we said, hey, can we have enforcement powers here? And the rest of the world said, no, we're just going to assume it, because we'll stretch the law over here, we'll stretch our circumcision law over here, and we'll just bypass this entire system of international cooperation. And by the way, our system's a lousy system. Mr. Udall's YouTube say it's not working. Of course it's not working. If you want to address this problem correctly, follow that system. Follow the system of requiring these countries to have aggressive enforcement, and don't have a system where my clients who have been held from Eastport, Maine, first place to see the sun in the United States, to Honolulu, Hawaii, where you have new folks. I've been not every place in between, but those extremes and many places in between. These folks feel like hostages. Because of this system where there's an agreement that they're going to be forced off a vessel, if they have counsel, and counsel says, hey, I want to be involved in these discussions about whether my client's going to be forced into the United States, government is not going to respond. It's just an agreement between the owner of the collateral, that's the ship owner, and the government lawyer or the Coast Guard. The crew is not listened to, and they're not cared about. This is an extraordinary abuse of basic human liberties, which somebody in Washington, D.C. figured out we have to engage in so that we can prove that foreigners, while they weren't in this country, violated the laws of the Republic of Liberia. They didn't violate MARPOL because MARPOL is only an agreement between countries. Mr. McAuliffe, I'm getting the impression from what you're saying that this only happens in the United States, that it would not happen in any nation in Africa, in Europe, in South America. Is that the case? Captain Katsoulis' deposition testimony was read into the record at trial. He's dealt with the actual pirates on the Horn of Africa and told me that he'd rather deal with them, that there is no place else in the world where seafarers are treated this way. The folks that I've represented around the country suffer from severe depression, anxiety. Captain Katsoulis was asked at the start of his deposition, where are you staying currently? Instead of responding, the extended stay in America, he responded, the indefinite stay in America. They have no idea when they're going to go home. I have represented folks who had held here for a year before I was their lawyer, and nobody had told them that this agreement for the release of the vessel was of questionable legality, even though they had counsel. It doesn't happen elsewhere. We can have a good system of enforcing the treaty. We can have respect for basic human rights by following exactly the enforcement mechanism prescribed by the treaty. Do you dispute that the records that were observed in this case by the Coast Guard were inaccurate? Interestingly, your honor, there were depositions taken by the entire crew. I was in trial counsel. Nobody on that vessel, everybody who testified at a deposition said there's no way Chief Pastraris would ever pollute, there's no way he would ever lie. There's no chance of that. I represented those seafarers, and I've represented over 100, and I always tell them, my clients, look, there's a few things I can do for you here. I keep you out of trouble. I can get you home as fast as I possibly can, if that's what you want to do, or if you want, I'll help you get an award. If you can tell the Coast Guard what they want to hear, you can make hundreds of thousands of dollars. I always tell them up front, and in fact, I had a couple of guys up here in Maine who, because they were willing to help and wanted to go home in the meantime, the government structured a plea deal so they couldn't get an award. The judge rejected it, and eventually the government agreed to a plea deal where my clients could get an award, and they got an award over the government's objection. And why did the government object? Because it wants a system where people report the problem initially to the United States and agree to stay here for a year or more when there's no need of it. They could give a Rule 15 deposition. They could agree to come back to trial. Those guys all did, but we are so wildly disregarding basic human rights of these seafarers who used to be, in our courts, wards and admiralty. Now, quite literally, your honors, they feel like hostages. They suffer from tremendous amounts of depression. Several of my clients do not go to sea anymore. They can't run the risk of being detained in some port state, but to answer the court's question, no, there's no other port state in the world that would take seafarers as substitute collateral for the release of a vessel and hold them while it investigates, decides whether to prosecute, decides whether to interview, and seeks to get a fine from the defendant, which, by the way, is a heck of a criminal justice system we're running here. The defendant wants a trial? You can have a trial, but you're going to have to pay. The cost is usually 50,000, 70,000 bucks a month to house, feed, and pay folks that leave the forced popular vessels, some of whom might be witnesses and many of whom won't be witnesses. Nobody, none of the witnesses here, none of the hostages here testified at trial because none of them had any information that was helpful to the government. So, I don't, to answer the court's question directly, I spent six days on that vessel. I spent a fair amount of that time with Chief Astartes. Do I dispute that? I personally, I wasn't convinced by it. I wasn't a trial counsel. I didn't get the decision not to call him. I didn't get the decision by the defense not to call any of the other seafarers, but the record evidence is the record evidence. You know, we haven't, I think in an appeal, asserting that the records were fully accurate. So, I haven't appealed that issue. So, even though I can't agree with the court in its interpretation of it, because of my own involvement, but that's not the issue we've chosen to focus on in this appeal. We've chosen to focus on the importance of using the enforcement mechanism that's readily available and was agreed to by the United States, relayed to the Senate when they adopted the treaty, understood by Congress when it passed the act, and the closest any court has come through to sort of putting that together was this court in Abrigar, but I appreciate Judge McKee's work. I mean, I had the 2007 case up here. I didn't realize that Maintain wasn't in the MARFA regulations. I figured it was. I figured we adopted the MARFA regulations. It's probably just there. I didn't check. It was sometime during the related case down in Delaware where I figured that out, and then I'm going, well, how did Maintain get in there? Was it some clever U.S. place? Hey, we'll put an ambiguous word in there, and we'll try to use it to get enforcement power, and I was like, oh my, what am I going to do if I find that answer? It doesn't carry forward from the old regulations. Yeah, I think I missed Patrick's cue that your time has expired. I'm sure he sent to me, but I didn't see it, but you deserve some time for rebuttal, so let's hear from, correct me if I'm mispronouncing the name, which is probably him, Ms. Shaila Kumari. Okay, yes, Mary Shaila Kumari for the United States, Your Honor. Let me ask you, if you are right, why the hell do we have this treaty structure? Why do we have this thing where you go to the country whose flag the ship is flying, file a complaint, and if you're not satisfied with what they do, you go to the IMO. Why do we have that whole thing? As you're answering that, what do we make of Mr. Train's testimony and what he was arguing for that clearly is not within the treaty that was enacted? Yes, Your Honor, so I think it's very important to be clear about what the charge was in this case. It was about failing to maintain an accurate record in U.S. waters. It was not about, there was no charge here concerning the discharge. I mean, there was no charge about discharging on the high seas. There was no charge about failing to maintain an accurate record on the high seas or anything that happened on the high seas. That was the court's charge. But then what did he do while he was in the port? Well, the charge for count one is that while in port, they failed to maintain an accurate record book. Based on what conduct? Based on conduct that took place outside of the U.S. territorial waters or conduct that took place within U.S. territorial waters? So what the courts in Joe and Ionia and I think Ebergar implied is that while you, as soon as you answer his question, don't start to question the answer by saying what Joe and Ionia, but just answer the question, what was the conduct? The conduct was the failure to maintain, once you're in port, you have to have an accurate record book. The book itself when they, you know, it was presented to the Coast Guard, but the book itself while in port was not accurate. Based on conduct that took place outside of the United States. That was the inaccuracy, right? The inaccuracy, well, I think count one is. Yes or no? Yes, sure. So the inaccuracy is about the discharges that happened abroad. That's what the inaccuracy was about. That's what the lie was about. But in fact, the lie happened in port because the book wasn't accurate. But you're right, Your Honor, the discharges, the specific charges. So that would give the United States worldwide jurisdiction over anything that happens if it wasn't documented in the book, right? No, and if I can clarify. So what we say in the brief, and I think this kind of explains the distinction, the United States could not charge the officers or anyone for discharging oil overseas. If they had been accurate about that in the book, if they said our equipment failed, it didn't work. There's no charge here. In this case, we would say, well, you report yourself reported in the book. We can refer the matter to the flag state. But the charge is not about the dumping. The charge is about lying in the United States about the equipment and about what happened. But the dumping, you're putting the equipment in there because the equipment is still on the boat in the port. But the problem is not the equipment. The problem is the dumping. The equipment could be totally lousy and totally malfunctioned. But if there was no dumping because of the crappy equipment, there'd be no issue here. I think you'd agree with that. Both the equipment, it has to, both Marshall and U.S. law require that you have to have, you can't discharge over 15 parts per million, and it has to go through proper equipment. And that's why there was a lie, of course, because the record book didn't mention that there was any failure in the equipment. Would it go through the equipment and the record? It appears that it occurred outside of the United States. And that is not, again, it's not the dumping or the failure of the equipment outside the United States. If they had been honest about that in the book, there would be no charge. It is the lying to the United States. And it's incredibly important. It does have a purpose. So the lie is the omission from the book. Once that book enters U.S. territory, it has to be accurate worldwide. It has to be both Marshall and the U.S. Regardless of where the conduct took place, it has to be accurate for everywhere that boat's been over the last three years. Yes. Yes. So the problem is a misrepresentation to port authorities. Is that basically it? That's right. And it's very important, Your Honors, because one of the purposes of Marshall and one of the purposes of these port state control inspections is to make sure that that U.S. waters. How do ship captains or ship engineers know that they would subject, they would be subject to such a penalty coming into a U.S. port? This is U.S. law. It's been the U.S. law for over 10 years. And the record in this case establishes that the chief engineer was an experienced engineer for the last 15 years. They regularly come to U.S. ports. There's the record also established that there was company policy on the ship required that they follow these laws. Their own record book, the Liberian record book. Basically, the thought is we have records. Those records have to be accurate or else you're in trouble, basically. Under this provision of the regulations, and I will say it's not simply that if you had a mistake or if it was an accident, then there wouldn't be a charge. The jury found he knowingly and willfully caused the master to fail to maintain the accurate records here. But you said the purpose of the treaty obligation and the resulting regulations and statutes are to make sure that a dangerous ship does not come into U.S. waters. Did I miss quoting you on that? That is one of the purposes of the regulation, yes. It's dangerous because of what happens in international waters. It's no longer dangerous. If it discharges everything in the middle of the ocean, comes into the U.S. port with no bilge water, nothing, and no discharges made once it comes into the U.S. port. It's not a dangerous ship. Go ahead. I would disagree with that, Your Honor, and I think this case shows why. In this case, the oily water separator that is supposed to function to filter the bilge water was completely inoperable, and the U.S. inspectors had to actually take it apart, replace it. So this ship came into port with a malfunctioning oily water separator. If we, under Mr. McCall's theory- Is that what he was charged with? Was he charged with coming into port with a malfunctioning separator? No, no. But I point that out because that is the purpose of the need for why the Coast Guard inspectors need to have accurate records. That is the purpose behind the maintain obligation. Why not? That would be easy because then you don't have to deal with international duty obligations. You just go to Congress. Let's assume that you get there on the day when it's actually functioning. So you'll have to pick your timing of this very, very, very carefully. You might have to wait a while or jump into the wayback machine. But let's assume you go to Congress and you ask for a statute which makes it a crime to come into U.S. waters with equipment that is not functioning. That's what you do, as opposed to you saying this statute is being then used to create a law which prohibits a boat from coming into U.S. waters with malfunctioning equipment. But that's not at all what the treaty says. Why not just create a statute? Forget the treaty stuff. Just get a statute. Showing that into U.S. waters with equipment that is malfunctioning, period. Really simple. Don't get around to all this esoteric stuff of originalism and textual interpretation. Really simple stuff. To come into the United States with stuff on your boat, it's got to work. Well, they certainly could do that, Your Honor. But the statute and the regulations that we have do allow inspections of the equipment. But they also, this requirement for being honest in court and having accurate records, I think is consistent with what MARPL requires. If a ship is complying with international regulations, which this ship must as a party to MARPL, it wouldn't have to do anything upon entering U.S. waters. It would have a book with accurate records. So the U.S. requirements are consistent. And I think to answer your question, Judge McKee, it's not just to protect U.S. waters, but one of the purposes of being able to inspect the book is to then, let's say they were honest and they self-reported and they said, yeah, we had an equipment malfunction. Then the United States could report that to the flag state and the flag state could investigate what happened on the high seas and whether there was a discharge. But that's what's twofold. It protects the U.S. waters. It allows us to fully know what was our waters. It also allows the United States to make referrals to flag states to assist in the cooperative enforcement regime. To your knowledge, have any of those referrals ever been made? This is not in the records, Your Honor. However, you know, I think. That's what I said to your knowledge. And I'm not sure, and I may be unfair in asking this, but I'm not sure how many of these cases you handle. If you don't have that kind of background, you can't answer the question and don't worry about that. I don't want to try to bootstrap you. I'm just curious because you're saying that the thing can work in a certain way. Mr. McCall is representing it doesn't work that way. It just never, ever happens. And he's representing that the person he's representing would rather deal with pirates off the coast of Africa than U.S. Customs. That's a pretty strong statement. And I'm just trying to find out, in your knowledge, has the U.S. ever gone through this treaty application and made a referral to the flag state? I don't have knowledge of that, Your Honor. What I can represent is my understanding is that the flag state representatives are available at port, and so they're aware of what is happening. And certainly our interpretation of this regulation doesn't preclude Liberia from, you know, enforcing the law against the ship for what happened on the high seas. This is the U.S. enforcing its part of the what happens at the port. And certainly other countries, if they want to enforce MARPL, they can, they have full authority to make charges for the activity that happened on the high seas. And I think, but the main point is that, you know, our first cut argument is that when you look at the definition of maintain, we think it is clear based on... First of all, where did the word come from? When you look at the definition of maintain, where does that word come from? And why are we looking at maintain? Because it is in 33 CFR 151.25. That is the regulation that he was charged under. That regulation is a federal regulation. It's the oil record book regulation. It requires the ship, and this is the master's responsibility, to maintain oil record books. So give me the slide again. 33 CFR. 33 CFR 151.25. Subsection J requires that the master maintain records. And that is what, this is a U.S. charge. This is not a charge under MARPL. The charge under count one is that he violated the federal regulation, which under the act, under 33 U.S.C. 1907 and 1908, is made crime. If you violate the under the act in U.S. waters, then that is a crime under the statute. And that is what count one is about. It is not... So this has nothing to do with MARPL? Because the word maintain does not appear in MARPL. Is that correct? That is correct, your honor. I'm sorry. Go ahead. No, I would say that we think that the requirements are consistent. It doesn't use the word maintain, but MARPL annex one regulation 15 is the same type of... It has oil record book requirements. You have to make the entries, keep it for years. We think that that's implicit under MARPL. You also have to maintain accurate records. Although it is true, MARPL does not use that word. Commissioner McColl made a very compelling argument that the word doesn't appear in MARPL. You agree it doesn't appear in MARPL? It does not appear in MARPL. And this is not a charge under MARPL. Okay. So the charge is strictly tethered to the CFR. Exactly. Exactly. And if I may, I would say the admission that under the defendant's theory, you would have two sets of books. I think that is incredibly significant here because under the defendant's theory, they would say you can come into US waters. The Coast Guard has no authority to look at anything except for a paper certificate, cannot inspect the equipment, cannot look at the books, but the books, of course, can be empty or full. And that is supposed to enable the United States to protect its waters and make referrals. It just doesn't make any sense from a common gender perspective. When you say protect its waters, that's the rabbit in the hat that I'm having trouble with because the focus here, despite the court's charge, does seem to be not the US rejecting its waters, but protecting international waters. And you can make a strong valid objective, but I'm not certain that that is something that is empowered under MARPL or the APPS. I understand what you're saying, but you always seem to be equating protecting international waters with protecting the US waters. And that may well be the same thing, but it's not what the treaty says. Well, I think the purpose is both, but in terms of why it's important to have accurate records, this shift came into you, a malfunctioning equipment. So it was a danger to the US waters. That's not the charge. Again, that's right. That's right. That's not the charge. That's not the charge, but it's to explain the purpose. You need to look at the plain text structure. And if you even get to the purpose of the word maintain, what does maintain mean in the federal regulation? That is when, as a third argument, I think you would look to what should maintain mean, and we say it means keeping an accurate record, not just holding on to a fake book. So to decide this case, can we ignore the treaty altogether and focus our discussion on the CFR? I think, yes, you can, your honor. Yes. It's a direct charge under the federal regulation that's made criminal under the statute. And that's the way he was indicted? Yes. You sure about that? That's what the indictment read? Yes. The indictment might discuss MARPL, but count one of the indictment is a strictly a charge under 33 U.S.C. 1908 and 18 U.S.C. 2 for aiding and abetting. What if the record book had accurately reflected the illegal discharges, and his name is Astartes, I think. Astartes willingly explained to the Coast Guard officials that the filtration system was not working. What would happen there? Would there have been a violation? If he, if the record book accurately reflected the problems and he told the Coast Guard inspectors, the filtration system is not working, he just told the inspectors. That would not be, then there would be no charge because there would be no, there would be no count one charge because the record books would reflect what was happening. They'd be accurate. And there probably wouldn't be any of the other charges because he wouldn't, the other counts in this case, the final 18 counts are all about his lies on the ship. So I think I'm, yeah. So the problem here is the misrepresentation or verbal. All of it. I mean, that's why there's multiple counts and I can walk you through that. But essentially the case comes down to misrepresentation and lying to Coast Guard inspectors. Thank you. I'm sorry. Is there, is there another question about the maintain? So there's just a couple of other points on this, on this count, and then I can move to the other counts or ask to enter any other questions that you have. You know, again, I think Mr. McCall suggested that there was nothing false in the records and that is not true. That's what the charge, you know, the records were false and that was proven to the jury and they didn't appeal that. In terms of, there's a lot of discussion about, you know, construction and the opposing counsel just talked about Nassir and the Kaiser case. Those are irrelevant here. We are not asking for deference. We are saying that under their plain language purpose and, you know, content of the regulation that its meaning is clear and that is what the Second and Fifth Circuit have held as well. There was, and Judge McKee, I hope I answered your question about the legislative history and the drafting history. My understanding about what, what Mr. McCall was pointing to was that during the history of MARPOL, the United States may have wanted to get authority to actually discharges, but that is different than what is happening here. And then finally, Mr. McCall makes, makes a lot of discussion about the, the ships being used and people on the ship being used as human collateral. I mean, that was not, that's not an issue really in this case. It was not, I think it's atmospheric, but I would say, you know, that the United States has authority to detain the ship and use that authority under 33 U.S.C. 1904. And the statute, the Act to Prevent Pollution for Ships actually provides a remedy under 1904H for people to, as they have compensation for loss for the, for some kind of erroneous detention. So that's just a red herring, but you know, it's not an appeal and there are avenues that people believe they have been held improperly. Well, I'm reading now from the testimony from, from Train. And he said, that's, for example, as I understand, this is before the committee was considering this. And he said, as I understand that Mr. Chairman, if a ship of another country commits a violation, which we know about on the high seas, it enters our jurisdiction. We as port state, but non-flag state cannot prosecute that vessel for the violation that occurred outside of our jurisdiction. However, we can report it to the flag state itself, which is what your point is saying. You're saying that the prosecution here is not for the violation on the high seas, but to tell you the report that occurred inside U.S. waters, which is what the district court instructed. That's right. And your honor, that's the distinction. It's not the charge here is strictly under the federal regulation for the inaccurate record book. It is not about the discharges. But Dustin, there's got to be some way to avoid, maybe it's not for a court to do it, some way to avoid a situation where folks, let's assume that the engineer here was culpable, that he knew about this. And even though the folks on his vessel were saying he would never do it, let's assume that he was culpable, that he was the one who was responsible for the malfunctioning, because the valve wasn't malfunctioning. It was working consistently with what it was intended to do. And that was to close off the place where the oil could be measured, the price per million could be measured. But none of the sailors and none of the merchants on the ship knew about it. To then allow a regime where here, I guess it was 11, but it could be the entire crew, and maybe if it wasn't the entire crew, could be held hostage. That just seems to me, with no process really, that just seems to be something that a court ought not to tolerate. If there's a way to get a handle on it, maybe there isn't, but that just seems like an intolerable situation. And especially if this is going on all over the world, when there's another mechanism in place through the flag jurisdiction to deal with this. So a couple of responses, Your Honor. First of all, whether or not anybody was held improperly is not before this court. But more importantly, there was no evidence in the record, and there's no citation in the brief that this is actually happening. I think this is a lot of hyperbole. In this particular case, the ship was detained. However, I think we have to remember that these are crewmen who are, their entire time being employed in criminal contracts, they are on the ship. They are, I don't believe that they were personally detained, but their ship, where they work, and where they have been, they've been detained while they are working on the high seas this entire time. So I don't think that's an accurate way to describe how Mr. McCall is describing it. But in any event, none of that is before this court. That is, whether or not anybody was detained or the ship was detained is not on appeal. I'd like to just quickly turn to the Title 18 counts, if there are any questions on them. I think Judge Fuentes, you asked about what that conduct was in terms of the lies. Count two is about the false statement with the intent to obstruct the, the false, I'm sorry, making the false entry in the record with the intent to obstruct the investigation. Count three is about, as the district court judge said, the charade that Rossard's engaged in when he tried to trick the inspectors when he demonstrated the equipment by having the valve off. And count four is about the false statement about how he operated, how he operated the equipment. There's, we don't believe that there's the motion to suppress there's anything there in terms of the oil record book. This court has a number of bases to affirm the district court's decision on the motion to suppress, including as the district court found that the, that there was reasonable suspicion at the time that the Coast Guard inspectors actually took the oil record book based on all of the misrepresentation and Mr. Rossard's conduct during the inspection. And if there are any further questions on the Title 18 counts, I will just say a word about sentencing. Well, the sentencing, I think we all agree that it's a banishment thing, which I don't know where it came from, but that it's totally improper. Yes, your honor. Yes, your honor. So we would ask on sentencing. Our preference would be that this court remand with instructions to correct the probation condition. To make it clear that Rossard cannot be a crew member, cannot be employed as a crew member on a commercial vessel in U.S. waters. Okay. I thought you were saying, okay, with the point of agreement, then it's not as broad as I thought. I think Mr. McCall is arguing it and we can ask him that the requirement, as I understand it, that now exists, he's basically banished from the United States. He can't come into the United States. You're saying that you don't, you agree that that's improper, but you would ask that we simply require the district court to prohibit him from being a crew member on a ship coming to the United States, which may actually totally destroy the man's career. I don't know what options you would have, but what would your authority be for that kind of restriction on the sentence? That is what we are asking for. The authority, we don't think it presents a banishment problem and the authority would be under the probation statute, 18 U.S.C. 3563B, subsection five, allows that a special condition of probation can be a sufficiently related to the conduct here. And during the sentencing hearing- That restriction on employment might prohibit future employment. I just don't know, but it seems to me that if we would agree to you, the district court ought to hold the hearing to find out what impact, if any, that would have on his ability to earn an income in the past. From what your partner has said, he may not want to come back to the U.S. anyway, but assuming that he I'm really reluctant to require a condition that would maybe jeopardize the man's welfare. I just don't know if it would or not, but conceivably the way shipping lines run, that if you can't, if you're barred from serving on a vessel coming to the United States, you may be basically, especially depending on who your employer is, you may be barred from serving on a vessel, period. So you want to prohibit him from even being in U.S. waters, not just the port, so your suggestion is he not be employed on any boat that travels through U.S. waters? No, our suggestion is that he be prevented from being employed as a crewman on a commercial ship in U.S. waters. He can come into U.S. waters on a ship, but we would bar him from working in this type of job in U.S. waters. If he goes on vacation, or if he takes leave without pay, wherever those waters are that go between U.S. waters and the high seas, he sends a telegram or a Wi-Fi or message to some kind of employer saying, I'd like to take a leave without pay. Dude has no problem with that. He's on the ship, he comes in, he's not working, and then as soon as the boat leaves the U.S. waters, he sends another telegram saying, I feel much better today. Back on the clock. Back on the clock. Clocked me in, and that's kind of ridiculous. I think that's a very specific question, but yeah, I think that the concern that the United States had, and again, he was not in prison, right? This was just the only condition that the district court was able to impose, and we're concerned with him working in this job during probation because it was in this job that he committed this willful conduct. I don't know exactly how, we don't have a concern with him coming into the United States on vacation. We don't have a concern as long as he has authority under the Immigration Act. It's the concern, the one probation condition that we asked for and that we think is based on his conduct as a jury found after a seven-day trial is that he shouldn't be employed in this capacity because it is that capacity that allowed him to commit these violations. So it would be the employment that the United States would be concerned about. Certainly, Your Honors, we have no problem with a remand for resentencing so that the district court judge can consider these kinds of questions in the first instance, but we think the court could remand with those instructions at this point if it were so inclined. Okay, anything else, Judge Fuentes or Judge Estrepo? Okay, we'll get back again to Mr. McCaw. Mr. McCaw, let me ask you, the distinction she's making is one that only lawyers could make. It's the kind of distinction that I'm sure has given lawyers a bad name throughout history, but it nevertheless is a valid distinction, isn't it, that he's being charged with and convicted of the misconduct that occurred in U.S. waters, basically lying about something that occurred on the high seas, which is consistent with the district court's instruction. It's a lawyerly distinction, Your Honor, but not accurate in this case. Chief Vestardus, under the instructions, wasn't tried or convicted on count one of lying to the United States. There was no allegation in the count and no instruction that there had to be a misrepresentation by him to the United States. It was purely the court's interpreting based on Ionian management and Joe that the chief and that the captain's failure to maintain an accurate record book here, even though the captain didn't know the record book was inaccurate, was a violation of U.S. law and it was caused by under 18 U.S.C. section 2b, which got called aiding and abetting, but it's not the aiding and abetting statute. It's the willfully causing statute. It was caused by what the chief did. And the allegations relevant to count one are very clear that what he allegedly did was write things in the book on specific days. During none of those days was he or the vessel ever in the United States. So he is charged by causing, by his high seas conduct, the captain to unintentionally violate the maintain requirement that's written for these regulations and were carried over from the old. Basically, going back to the discussion we had on your initial argument in terms of the difference between constant count four as opposed to one or two, he's saying that her argument, if doubt, and I understand you're not accepting it, may well go to sustain the conviction of the count three obstruction under 1505 and count four false statements, but it would not excuse the conviction on count one and two. I get the argument on counts three and four. As I responded to the court's question earlier, those are tougher counts for us. If we would agree with you as to counts one and two, you're not alleging that the evidence is to have tainted the evidence that would have come in under count three or four. Maybe you are. I must have made it in the brief, but the argument wasn't really presented that way. What should we do in that event? If we say you're right on count one and two, that's extraterritoriality, but not counts three and four. Go ahead. I'm sorry. The court should do what the Fifth Circuit did in Fathalios, which was to strike those counts of conviction. In Fathalios, very interesting cases compared to Joe, and it involves the chief engineer conduct outside of the country. Fathalios reversed the conviction of a chief engineer for failing to maintain an accurate oil record book in the United States because it said under 151.25J, that's the captain's job. By the way, in that case, the government argued, no, no, no, that just means possess the book. It's 151.25A that has any accuracy component to it. The court struck that conviction. Mr. Fathalios had an appeal from his other counts of conviction, which were similar to these. The case was remanded for an entry of a judgment of acquittal on count one in that case, and the other counts stayed. In this case, I agree there should be a remand if any counts survive for resentencing, and it would be appropriate. I have a lot of regard for Judge Andrews. We disagreed on a bunch of issues in this and a related case, but he's a very good judge, and the case should be remanded for him in the first instance to decide what changes should be made to his sentence if any counts of conviction survive. Fathalios is very important on that issue because it leaves a real question. Where's the Fifth Circuit law stand now? They upheld the conviction in Joe, but overturned it in Fathalios for failing to maintain a record by the chief engineer, and the government here got around Fathalios by saying, well, we're not discharging willfully caused, but all of the willful causing happened on the high seas only in violation of Liberian law. It shows how difficult this is. I'd like to make one other point about the regulation government counsels make. 151.25 actually has the word maintain three times in it. None of those are in MARPOL regulations, and they may very well all have different reasons. They're definitely ambiguous, and the ambiguity should be resolved in my client's favor, Mr. Chief Astartes' favor. 151.09 makes clear that the entire regulation, 151.25, Title 33, applies only to foreign ships while they're here, and in 151.25 are detailed requirements for what to a chief engineer. Our law only requires you to make entries while you're here. Oh, but we're now going to interpret this word maintain, which only applies to the captain, as giving us jurisdiction to second guess your entries that we didn't require while you were on the high seas. That's a wildly inconsistent, unreasonable interpretation of the regulations for the purpose of prosecuting this on a worldwide basis, and to answer directly the court's question about what's really being prosecuted here. If the government was only prosecuting a record offense, there'd have been a referral to the Republic of Liberia to do something about the high seas conduct, but there isn't a referral to the Republic of Liberia to do about the high seas conduct because we advertise on YouTube that we enforce MARPOL on a worldwide basis. That's what we're really doing. We're twisting, stretching, and contorting the treaty, the statutes, and the rules to do it. We should respect international law. We can be the leader of the free world, but not this way. How do you spell the name of the park house that has that YouTube? UDELL. U-D-E-L-L. Where does he work out of? In the environmental crime section of the Department of Justice. He's out of D.C. These cases are usually prosecuted by that D.C. office. There was an AUSA involved in these cases early on. My experience with the AUSA is they're much easier to deal with because they deal with real criminals on a regular basis. In this video, does he suggest he's representing the position of the Department of Justice? He says specifically that enforcement of MARPOL by other countries is lax, or some word like that, and the United States is aggressively enforcing MARPOL. He promoted us being a Department of Justice lawyer in the videos. They're actually, some of them are hosted by, and the video encourages a report to a U.S.-based entity that then would relay a report to the Coast Guard. They do not want folks to stop the pollution. My guys in Maine literally stopped the pollution before the vessel ever came to Maine, and the government was upset with them because they didn't first report it to the U.S. government. It didn't make any sense at all. These are foreigners employed by a foreign country on a vessel flying to a foreign country, and we're upset that we weren't their first phone call? This is entirely backwards, but it's the system we have because absolute power does what it does. We really need to address it. We need to return to being the keeper of the wards of admiralty, respecting their liberty, and not holding them. I can tell you, Captain Katsoulis was not kidding. I remain in very close contact with Captain Katsoulis. I have standing invitations to visit him in Greece anytime. I have a very nice leather briefcase that he gave me with a tag that said, Ed McCall, the most honorable man in the U.S. legal system. He doesn't know that. It happens to be accurate, but he doesn't actually know it. If I had the name McCool, it would fit even more. But these guys, when they get here, when they become human collateral, they can go on the internet and say, oh, I work. I could be here for a couple years. It's a crazy, crazy system, and it's all bent on interpreting the word maintain as meaning, well, we only require you to make regular entries while you're here, but we have this word maintain, and that gives us authority to enforce any inaccuracy with respect to the entries our people have been running and held in this country for years. Mr. McCall, wasn't this a system, though, that was completely vetted and agreed to by international agreement? No, the system that I've said should be invoked is what was vetted and agreed to by international agreement. We just didn't like it. We proposed a system that we've just adopted by torturing our own people. These regulations are designed to prevent pollution by U.S. ships anywhere and by foreign ships here. That is not how we're interpreting these regulations. It's inconsistent with their plain meaning. Maintain something while you're here. I'm sorry, it does not mean maintain it before you get here. Let me ask you, in terms of sentencing, what is your position on that, on the remand-free sentencing? If a conviction survives the appeal, then there should be a remand to Judge Andrews. I think I would give him the next whack at fixing his mistake. I think that's a very thoughtful, smart judge. I don't think it's appropriate for the government to ask. This court can do what it wants, obviously, but to me, I would defer to the sentencing judge that heard the case, has met Mr. Bastardas, and he should decide what a replacement condition should be. That's my sense. Okay, anything further, Justice Chaparro-Fuentes? No. Okay, I want to thank counsel for a very, very helpful argument. I would like to get a transcript of the argument, and we'll ask the government to pay for the transcript, and Patrick, we'll take a break now for a few minutes, and Patrick can explain the process of getting the transcript. Some of my, all of my present and some of my future law clerks are tuned into this. As to the future law clerks, I don't want them to get spoiled. The quality of all arguments we get is not consistently up to the quality of arguments they've gotten today, so to the extent that they're thinking that they're going to come here and hear these really good attorneys make very skilled oral arguments and have a wonderful demeanor in the course of doing that, that is often not the case, so you two attorneys are more of the exception than the rule, but I want to thank you for your fine presentations here today.